UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -v-　　　　　　　　　　　　　　　　　16-cr-302 (KMK)

DEANNA DUNCAN,

              Defendant.

**MOTION FOR A REDUCTION IN SENTENCE PURSUANT TO 18 U.S.C.
§ 3582(C)(1)(A) ON BEHALF OF DEANNA DUNCAN**

 

Francis L. O'Reilly, Esq.
1735 Post Road, Suite 2C
Fairfield, CT 06824
Tel. 203-913-4608
Attflor@aol.com

*Attorney for Deanna Duncan*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

I.    FACTUAL BACKGROUND ............................................................................................ 3

    A. Ms. Duncan's Conviction and Sentencing .................................................... 3

    B. Ms. Duncan Has Exhausted Her Administrative Remedies ........................ 3

    C. Ms. Duncan's Medical Conditions and the BOP's Failure
       to Properly Address Them............................................................................. 3

    D. Ms. Duncan's Period of Incarceration ......................................................... 8

    E. The Harsh and Inhumane Experiences in BOP Custody During the
       COVID-19 Pandemic..................................................................................... 9

    F. Ms. Duncan's Continued Rehabilitation and Re-Entry Plan ........................ 9

II.    ARGUMENT .................................................................................................................. 10

    A. "Extraordinary and Compelling" Reasons Warrant a Sentence
        Reduction ................................................................................................... 10

    B. The 18 U.S.C. Section 3553 Factors Also Weigh in Favor of
        Resentencing and Releasing Ms. Duncan ................................................. 13

CONCLUSION ............................................................................................................................ 17

## PRELIMINARY STATEMENT

Deanna Duncan, through the undersigned, respectfully moves the Court pursuant to 18 U.S.C. § 3582(c)(1)(A) to modify her sentence and be re-sentence to time-served and a period of supervised release with a period of home detention. Ms. Duncan is a strong candidate for a reduction in sentence. The extraordinary and compelling circumstances are both abundant and overwhelming.

Ms. Duncan has served nearly 50% of her sentence. Annexed hereto as Exhibit A is a copy of BOP Computation Data sheet dated March 15, 2023. Her incarceration has been harrowing and far more punitive than her offense of conviction would have warranted in ordinary times. As the Court well knows, the state of prisons during the COVID-19 pandemic has been inhumane. As Judge Rakoff noted:

> [I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons.

See United States v. Jervis Cirino, 19-cr-323 (S.D.N.Y.); see also United States v. de Jesus, 20-cr-19 (S.D.N.Y.), July 1, 2020 Sentencing Tr., 36:16-18 (Engelmayer, D.J.) ("Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close."). Constant lockdowns have resulted in inmates locked in their cells for up to 23 hours a day, for weeks at a time and with zero social visits. The conditions of Ms. Duncan's incarceration have been more grueling than this Court could have anticipated at the time of her sentencing.

In addition to the harsh and inhumane prison conditions, Ms. Duncan has numerous additional extraordinary and compelling circumstances that make her an appropriate candidate worthy of a sentence reduction. Ms. Duncan suffers from numerous debilitating health conditions that are not being treated adequately by the BOP. These factors establish extraordinary and

compelling reasons justifying a reduction in sentence, and as discussed herein, the Section 3553 factors further support the relief requested.

**I.      FACTUAL BACKGROUND**

    **A.      Ms. Duncan's Conviction and Sentencing**

In October 2015, Ms. Duncan participated in a home-invasion robbery that resulted in the death of the homeowner. While Ms. Duncan was part of the robbery, she was not armed and did not herself shoot the victim. Ms. Duncan certainly did not intend for the victim to be shot and killed.

On July 5, 2017, the Court sentenced Ms. Duncan to 200 months imprisonment, to run concurrently, for one count of conspiracy to commit robbery and one count of robbery. The Court also imposed a period of supervised release of three years, to include participation in an outpatient mental health treatment program.

    **B.      Ms. Duncan Has Exhausted Her Administrative Remedies**

Ms. Duncan has exhausted her administrative remedies. On April 8, 2021, the Warden denied a request for compassionate release due to concerns about COVID-19. On September 20, 2021 and again on January 27, 2022, the Warden denied a request for a reduction in sentence due to Ms. Duncan's debilitating medical conditions. These denials are annexed hereto as Exhibit B.

    **C.      Ms. Duncan's Medical Conditions and the BOP's Failure to Properly Address Them**

Ms. Duncan is suffering from numerous health conditions. As noted on Exhibit C, among other ailments, Ms. Duncan currently suffers from the following health issues:

- Hypothyroidism
- Type 2 diabetes

- Hypertension

- Asthma

- Posttraumatic stress disorder

- Sleep apnea for which she has been prescribed a CPAC machine

- Sciatica

- Carpal tunnel syndrome

- Plantar fasciitis

- Disorder of iris and ciliary body; amblyopia

- Synovitis and tenosynovitis

- Enthesopathy

- Edema

- Abnormal uterine and vaginal bleeding

As noted on Exhibit D, Ms. Duncan is currently prescribed a litany of medications. The above records, however, do not tell the full story. Ms. Duncan is currently confined to a wheelchair. She was initially prescribed a wheelchair in August 2021 due to severe lymphedema (extreme swelling due to a malfunction of the lymphatic system that results in fluid build-up) and constant, debilitating pain in both her legs. She was initially instructed to use the wheelchair 40-50% of the time. While she initially wrapped her legs in ace bandages, the swelling has increased so much that she now uses special ordered Medline-Comprocares Leg Wraps, which are secured with Velcro straps.

Ms. Duncan's wheelchair confinement has now increased to 90-100%. After several months of complaints about severe pain in her right foot, an x-ray revealed severe Achilles tendon damage. Specifically, the Achilles tendon on her right foot has detached and is laying in

the bottom of the foot. She cannot put any pressure on her foot and any tiny step results in serious pain. This can only be fixed with surgery. Ms. Duncan has been waiting for an orthopedist consult since *April 2021*.

Moreover, because she is now confined to a wheelchair she is unable to help push the lymphatic fluid out of her legs caused by the lymphedema. The fluid build-up causes swelling, redness, orange peel skein texture and a burning sensation. See Exhibit E. Additional reasons medical reasons Ms. Duncan is confined to a wheelchair include C-spine deterioration (wear and tear affecting the spinal disks in the neck) and bone spurs. See id. Ms. Duncan requires a wheelchair since she no longer has the strength in her arms and hands to operate the wheelchair due to severe nerve damage in both arms, carpal tunnel syndrome in both hands and tendonitis. See Exhibits C, E. Getting in and out of the wheelchair is extremely difficult and taking a shower is nearly impossible. Because she cannot put any wight on her right foot, she is regularly unsteady and has fallen several times.

Further, in August 2022 echo cardiogram revealed Ms. Duncan's left ventricle "at the upper limits of normal," and with "grade 1 diastolic dysfunction." Annexed hereto as Exhibit F is a copy of the report. Diastolic dysfunction occurs when the lower heart chambers don't relax properly during diastole. Over time, diastolic dysfunction can lead to heart failure.

Ms. Duncan also has a lump on the right side of her collar bone that has been growing in size. See Exhibit G.[1] An x-ray was ordered in January 2023, but has still not been performed. Ms. Duncan also suffers from peripheral neuropathy, which results in severe pain and numbness in both arms and hands. As noted on Exhibit E, Ms. Duncan suffers from various skin conditions,

---

[1] The BOP unfortunately has the bad habit of responding to requests for follow-up medical procedures by falsely stating that there is no record of the procedure being ordered. See Exhibit G at p. 2. As discussed further herein, Hazelton is notorious for its horrific medical care of inmates.

including open sores on her body that have not healed. A physician's assistant told Ms. Duncan it may be skin cancer. While referred to a dermatologist, Ms. Duncan has not yet seen a specialist. See Exhibit E. Ms. Duncan also needs to see a gynecological oncologist and that appointment has not been scheduled. See Exhibit G.

When Ms. Duncan arrived at Hazelton in March 2018, she was able to climb stairs and lived in a second floor unit for two years. She can no longer climb stairs. In 2021, she was assigned to a first floor medical cell which allows extra space for wheelchair movement. Needless to say, Ms. Duncan can no longer walk the outside track for exercise. When she arrived at Hazelton, she was 217 pounds. She currently weighs 317 pounds and has a BMI in excess of 40, which is considered obese. Due to both her confinement to a wheelchair, as well as the various health issues related to her legs and feet, she is unable to exercise.

Ms. Duncan is also having difficulty getting the medication that she needs. Since had been prescribed 200 mg of Carbamzepine four times a day for treatment of her peripheral neuropathy. Peripheral neuropathy is a result of damage to the nerves located outside of the brain and spinal cord (peripheral nerves), which often causes weakness, numbness and severe pain, usually in the hands and feet. It can also affect other areas and body functions including digestion, urination and circulation.

In September 2022, Ms. Duncan was only approved for a one-month refill, instead of the six-month refills that she had previously been receiving. As a result, Ms. Duncan was without this medication for most of October and suffered constant pain throughout her body. Then when she received the pills, she only received enough through November 17. After that, she never received another dosage of Carbamzepine. Ms. Duncan went cold turkey with regard to a medication that was being used to treat her debilitating and constant pain. It was nothing short of

torture for her. When asked why she no longer can receive Carbamzepine, Ms. Duncan was told that it was "non-formulary." When she discussed alternatives with the physicians' assistant, it was suggested she take Effexor, but that is a psych medication that Ms. Duncan knows some of the inmates use to get high and have even overdosed on. Ms. Duncan did not want to start taking that medication. Ms. Duncan is *still* waiting for a follow-up visit to discuss alternatives to Carbamzepine. See Exhibit H.

As another example, on December 5, 2022, Ms. Duncan was prescribed 100 mg of Losartan Potassium to treat her high blood pressure. The dosage was later increased, and to date, she has not received the increased dosage. See Exhibit I.[2]

Over the past two years, Ms. Duncan was told that she would be scheduled for follow-up visits outside the BOP for the following conditions, yet to date, no such appointments have been made:

- Orthopedic surgeon for her detached Achilles tendon and an MRI of right knee;

- Neurologist for neuropathy of arms/hands/fingers with numbness and constant pain, bilateral carpal tunnel syndrome and EMG for nerve studies;

- Gynecologist/Oncologist for abnormal pap smear results in 2021 and 2022 and continual vaginal bleeding for over two years;

- Endoscopy for severe acid reflux with vomiting and choking; and

- Cardiologist, for follow-up on her 2022 Echocardiogram.

Other inmates at FCI Hazelton, which has been coined "Misery Mountain," have recounted similar difficulties with getting access to doctors and necessary medical treatment. See P. Bailey, FCI: Hazelton: Called 'Misery Mountain' for a Reason, More Than Our Crimes,

---

[2] As noted above, the BOP's response to Ms. Duncan's request for the prescription to be filled was that they have no record of the order being placed, which is simply false. See Exhibit I at p. 2.

https://morethanourcrimes.org/voices/fci-hazelton-cauldron-of-misery/ (Sept. 5, 2022) (FCI Hazelton inmates recounting months-long gaps to see a doctor or receive necessary medical treatment despite medical staff being aware of their serious health conditions).

### D. Ms. Duncan's Period of Incarceration

Ms. Duncan has taken every opportunity to use her period of incarceration productively. Since her designation, she has been housed at FCI Hazelton, a medium federal correctional institute with a secure female facility.

While incarcerated Ms. Duncan has taken advantage of the BOP programming. Since 2017, she has taken nearly 40 classes, and is currently enrolled in several more.[3] Some of the classes Ms. Duncan has taken include: Drug Education, Emotional Self Regulation, Financial Literacy and Women's Career Exploration, a three-part series.

Notably, in the last nearly seven years, Ms. Duncan has had no significant disciplinary history. Upon information and belief, she has had three incident reports. The first is from May 2018. Ms. Duncan's cellmate had a bra with an underwire and both Ms. Duncan and the cellmate were written up. The incident was expunged against Ms. Duncan after it was determined it was not her undergarment. In May 2019, Ms. Duncan allowed her cellmate to use her phone PIN after learning her cellmate's brother had died. Ms. Duncan was written up and lost phone privileges for 90 days. Last, in 2020, Ms. Duncan received an incident report for having medication she purchased at the commissary in an unlabeled pill bottle and no longer in the box it came. Ms. Duncan lost email service for 30 days. This is the sum total of disciplinary action against Ms. Duncan.

---

[3] We are awaiting an official BOP document of Ms. Duncan's completed classes. Annexed hereto as Exhibit J is Ms. Duncan's handwritten list of the classes she has completed or is currently taking.

E. **The Harsh and Inhumane Experiences in BOP Custody During the COVID Pandemic**

Ms. Duncan's time in prison has been more punitive than the Court could have anticipated when it imposed her sentence in 2017. Of course, the Court could never have predicted an unprecedented global pandemic.

Because the BOP was so unprepared to deal with the pandemic, it resorted to constant lockdowns, with inmates in their cells for up to 23-hours a day, for weeks at a time. For a good period of time when the pandemic first started, inmates were not able to leave their cells for more than a few minutes once a day or every other day to use the phone or computer. Ms. Duncan estimates that she has spent about half of her time at Hazelton in lockdown over the past three years.

Even when the lockdowns were "lifted," inmates were given only somewhere between 30-minutes to two hours to shower, contact their family and access computers to email loved-ones. Most detrimental to the well-being of the inmates, social visits were suspended for nearly two years. Further, programming and recreation were severely curtailed throughout this time as well.

The conditions during the pandemic were horrific. For a period of several weeks in June 2020, Hazelton did not have water. Because there was no working water, and thus, no flushing toilets, inmates had to use garbage bags for their waste when they used the bathroom. The facility eventually had to bring in porta-potties for the inmates to use.

F. **Ms. Duncan's Continued Rehabilitation and Re-Entry Plan**

Ms. Duncan remains committed to rehabilitation and re-entering society as a completely reformed individual.

Upon her release, she will reside with her daughter in Woodridge, New Jersey. Her daughter is a single parent of four children. Ms. Duncan will help raise the children and ease the cost of childcare.

II.     ARGUMENT

    A.     **"Extraordinary and Compelling" Reasons Warrant a Sentence Reduction**

A Court may reduce a defendant's term of imprisonment pursuant to 18 U.S.C. Section 3582(c)(1)(A) after finding that "extraordinary and compelling reasons warrant such a reduction." A district court's discretion in considering such a motion is broad. As held by the Second Circuit in <u>United States v. Brooker</u>, 976 F.3d 228, 237 (2d Cir. 2020), "the First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release." The reasons for the Court to consider compassionate release for Ms. Duncan are plentiful.

It is clear that Ms. Duncan suffers from numerous medical conditions that have worsened since her incarceration. The BOP is simply not equipped to provide the necessary care. When Ms. Duncan entered Hazleton, she was able to walk, exercise and even held a job. Now, she is confined to a wheelchair.

FCI Hazelton is well known for providing lackluster health care to is inmates and in particular, its failure to provide timely treatment to ailing inmates. Ms. Duncan's conditions have worsened since her incarceration, and her several potentially serious conditions are simply being ignored. She has heart issues, an undiagnosed lump in her collar bone that has been growing in size, Type 2 diabetes, hypertension, asthma, among other potentially life-threatening health conditions.

Ms. Duncan also lives a largely sedentary lifestyle which further raises concerns about heightened risks of serious illness. She has gained over 100 pounds since her incarceration. Her weight, high blood pressure, lack of physical exercise and confinement to a wheelchair place her at serious risk of a heart attack. Moreover, even while bound to a wheelchair, Ms. Duncan is in constant pain due to the C-spine deterioration, lymphedema, arthritis and her detached Achilles tendon, for which she has been waiting two years to see an orthopedist.

In addition to those extremely compelling and extraordinary circumstances, we ask the Court to also consider the extremely harsh, and at times inhumane, circumstances of her imprisonment since this Court imposed sentence. Ms. Duncan has been incarcerated during a global pandemic. She has been locked down for months at a time and without any social visits for an extended period. In short, Ms. Duncan "ha[s] faced substantially more severe conditions during the COVID-19 pandemic than were contemplated at the time of sentencing, both because of the specter of contracting COVID-19 and the more significant restrictions that the BOP has had to institute in its efforts to control the pandemic, including curtailing prison programs, greater restrictions on movement, and suspension of visitation for a lengthy period of time." United States v. Davis, 2020 WL 6785351, *3 (D. Md. Nov. 19, 2000) (granting compassionate release in part because "[t]he actual severity of Davis's sentence, because of the COVID-19 outbreak, exceeds what the Court anticipated at the time of sentencing"); see also United States ███████████████████████████████████████████████ (observing that "time served during the pandemic is harder than during normal times").

Moreover, as the Court is likely aware, due to the unusually harsh and unsanitary conditions, numerous courts in the Southern District have granted downward variances at the time of sentencing. See United States v. Daniel Gonzalez, 18-cr-669 (JPO) (sentencing defendant

11

to time-served and giving substantial weight to detention at MCC over the last year and in evaluating how much punishment asserting that it counted at least one and a half to times the actual amount of time); United States v. Juan Carlos Aracena de Jesus, 20-cr-19 (S.D.N.Y.) (PEA), Sent'g. Tr. at 37:6-11 (imposing a "substantially downward variance" in large part due to the "dreadful" conditions at the MCC during the COVID-19 pandemic and finding "Bottom line, your time in the MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest in December."); United States v. Ortiz, 19-cr-198 (S.D.N.Y.) (KPF), ECF # 52 at pp. 54-55 ("I hope that you are designated quickly. Because part of the reason for my downward variance was the conditions of confinement, which I think are … substantially harder than they would be if you were serving them at other times in history. I do think it's very difficult to be confined for 21 to 24 hours. I do think that the conditions in terms of your ability to have proper hygiene, your ability to practice social distancing, have all been compromised, and that has very much weighed into my decision..."); United States v. Hector Rivera, 16-cr-66 (SDNY) (AT) (recognizing that three months during COVID-19 is different than three months in normal times); United States v. Casillas, 19-cr-863 (S.D.N.Y.) (VSB) (reducing length of sentence in part based on conditions at MCC during COVID-19 crisis). We ask the Court to the unforeseen harsh conditions in re-sentencing Ms. Duncan.

Finally, Ms. Duncan's continued efforts at rehabilitation are yet another extraordinary and compelling reason in favor of her being resentenced to time-served. See United States v. Rodriguez, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020) (citing United States v. Brooker, 976 F.3d 228, 238 (2d Cir. 2020) and holding that while rehabilitation "alone" is insufficient, it can

"interact with the present coronavirus pandemic" to create an extraordinary and compelling reason for a sentence reduction"); see also United States v. Torres, 464 F. Supp. 3d 651, 661 - 665 (S.D.N.Y 2020) (holding that rehabilitation is relevant to whether there are extraordinary and compelling reasons for a sentence reduction under the "compassionate release" statute); United States v. Mieses, 2021 WL 1244420, *4 (S.D.N.Y. Jan. 13, 2021) (taking into consideration defendant's lack of disciplinary infractions in granting compassionate release); United States v. Marks, No. 03-CR-6033, 455 F. Supp. 3d 17, 36-37 (W.D.N.Y. Apr. 20, 2020) ("[G]iven Marks's clean disciplinary record for many years past, and his demonstrably successful efforts at rehabilitation, I conclude that upon release, he will not pose a danger to the community."); United States v. Cabrera, No. 01-10469-WGY, ECF. # 1057 (filed June 29, 2021) (deciding to "temper justice with mercy" and reducing drug king-pin's life sentence to time-served – 24.5 years – due to "especially the profound and extraordinary rehabilitation").

Ms. Duncan continues to make strides towards rehabilitation. The primary evidence of this is Ms. Duncan's continued efforts to educate herself. As noted on Exhibit J, she has taken numerous courses and it is respectfully submitted that the number would likely be double if not for the pandemic which canceled nearly all of the programming.

We respectfully submit that the extraordinary and compelling circumstances in this case are abundant and persuasive.

    **B.**    **The 18 U.S.C. Section 3553 Factors Also Weigh in Favor of Resentencing and Releasing Ms. Duncan**

Finally, we believe the Section 3553(a) factors support resentencing and releasing Ms. Duncan.

The need to provide medical care in the most effective manner weighs heavily in favor of allowing Ms. Duncan to seek medical treatment outside the confines of the BOP. See 18

U.S.C. § 3553(a)(2)(D); see also United States v. Gluzman, 7:96 Cr. 323 (LJL), 2020 WL 4233049, at *18-19 (S.D.N.Y. July 23, 2020) (granting motion for compassionate release upon recognizing that the "need . . . to provide the defendant with needed . . . medical care . . . in the most effective manner" weighed in favor of "early release"). Commentators have found significant issues with the BOP's provision of medical care services, noting, in particular, pervasive medical staffing shortages and treatment delays.[4] Even the Inspector General has noted that "providing adequate health care for inmates remains a challenge for the BOP," and "certain characteristics of the BOP's population heighten the challenge of providing proper care for inmates, including aging inmates, inmates with chronic illness, and inmates with mental health issues."[5] FCI Hazelton is no exception. Indeed, it has been coined "Misery Mountain" by the inmates that reside there, who have specifically—and repeatedly—recounted the prison's inadequate medical staff and services.[6]

Given Ms. Duncan's serious medical conditions, she is in dire need of timely access to medical care, and specialists that are actually equipped to provide her with treatments essential to address and mitigate the effects of her various health conditions. If released, Ms. Duncan would be able to get the medical treatment she needs, including, among other things, surgery on her foot, testing of the lump in her neck, as well as seeing a gynecological oncologist. See Gluzman, 2020 WL 4233049, at *19 (recognizing early release was the only way for defendant to obtain

---

[4] See, e.g., Erica Zunkel, 18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner," 9 Notre Dame J. Int'l & Comp. L 49, 57-64 (2019).

[5] U.S. Dep't of Justice, Office of the Inspector General, Top Management and Performance Challenges Facing the Department of Justice at 4 (2019), https://www.oversight.gov/sites/default/files/oigreports/2019.pdf.

[6] See P. Bailey, FCI: Hazelton: Called 'Misery Mountain' for a Reason, More Than Our Crimes, https://morethanourcrimes.org/voices/fci-hazelton-cauldron-of-misery/ (Sept. 5, 2022).

14

the "needed . . . medical care" she so desperately needed for her serious medical conditions); see also United States v. DiMasi, 220 F. Supp. 3d 173, 177 (D. Mass. 2016) (granting compassionate release motion upon recognizing that defendant, if released, "will have the liberty of selecting the doctors and hospitals he wants to treat him, and will have the opportunity to obtain what may be better medical care than he would if he remained in custody").

Further, Ms. Duncan is not a danger to society. See United States v. Ortega, 2023 WL 27552160, * 2 (S.D.N.Y. March 31, 2023) (granting motion to reduce sentence and noting that "it bears mentioning that the need for specific deterrence and the need to protect the public from further crimes of the defendant weighed much more heavily at the time of sentencing than they do today"). Instead, Ms. Duncan's current condition demonstrates that she is physically unable to reoffend. Specifically, Ms. Duncan's physical condition has severely limited her ability to complete daily, mundane tasks, much less engage in further criminal activity. See, e.g., United States v. Asaro, No. 17 Cr. 127, 2020 WL 1899221, at *1, *7 (E.D.N.Y. Apr. 17, 2020) (granting compassionate release to a previously violent defendant because his physical ailments, including expressive aphasia, made it unlikely that he remained capable to orchestrate complex criminal schemes); see also Ortega, 2023 WL 27552160, *2 (granting compassionate release to violent felon and finding that "given that Ortega's medical condition severely limits his ability to complete daily, mundane tasks such as brushing his teeth, Ortega's physical and mental capacity to reoffend is extremely limited"). Moreover, given her age and the numerous courses she has taken while incarcerated, she is at low risk of recidivating. See Education and Vocational Training in Prisons Reduced Recidivism, Improves Jon Outlook, RAND Corporation, Aug. 23, 201, found at https://www.rand.org/news/press/2013/08/22.html ("Prison inmates who receive general education and vocational training are significantly less likely to return to prison after

15

release and are more likely to find employment than peers who do not receive such opportunities").

Releasing Ms. Duncan—after serving more than seven years on the present sentence—would not minimize the severity of the offense. The impact the present sentence had on Ms. Duncan's life is profound and unmistakable. Her life will be forever impacted by her actions that led to a very lengthy federal sentence which coincided with an unprecedented global pandemic that claimed the lives of millions and made the conditions of her confinement far harsher. Ms. Duncan is keenly aware of her past inexcusable decisions and actions that led to the present sentence. She remains deeply remorseful and ashamed of her past and committed to not ever reoffending. If released, Ms. Duncan would be coming out of prison without her health. She has the full support of her family and if released will reside with her daughter in New Jersey.

For the reasons detailed above, the Section 3553(a) factors weigh in favor of finding that the time Ms. Duncan has already served is sufficient and that further incarceration would be greater than necessary to accomplish the goals of sentencing.

**CONCLUSION**

For the foregoing reasons, extraordinary and compelling reasons exist that warrant reduction of Ms. Duncan's sentence. Ms. Duncan therefore respectfully requests that the Court grant a reduction in her sentence to time-served.

Dated: May 4, 2023

                                              Respectfully submitted,

                                              /s/ Francis L. O'Reilly

                                              Francis L. O'Reilly, Esq.
                                              1735 Post Road, Suite 2C
                                              Fairfield, CT 06824
                                              Tell. 203-913-4608
                                              Attflor@aol.com

                                              *Attorney for defendant Deanna Duncan*

Application for compassionate release, pursuant to 18 U.S.C. Section 3582, is denied.  First, Ms. Duncan has failed to establish that there are extraordinary and compelling reasons for her early release.  To be sure, Ms. Duncan is dealing with some substantial medical challenges.  However, the objective evidence, found in the medical records, is that BOP is undertaking good faith efforts to address and treat the bulk of her medical challenges, including appointments with outside specialists.  Moreover, the records establish that Ms. Duncan has not cooperated in the provision of medical care, thus leading to the conclusion that some of her medical challenges are self-inflicted.  Thus, while prison time for Ms. Duncan has been harder than it would have been in the absence of, for example, the need to use a wheelchair, her medical conditions at this time do not make out an extraordinary or compelling reason to release her this early.  Second, consideration of the Section 3553(a) factors counsel strongly against early release.  Ms. Duncan played a major role in a violent robbery that resulted in the murder of a father in front of his young child.  Even if her medical challenges make Ms. Duncan less likely to resume her criminal ways, releasing her before she has served even half of her sentence would seriously undermine general deterrence and respect for the law.  Thus, for all these reasons, the application for early release is denied.

So Ordered.

6/7/23

17